UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

TIMOTHY W. STRAITS,

    Plaintiff,

    v.

CITY OF LANCASTER,
OHIO POLICE DEPARTMENT, et al.,

    Defendants.

Case No. 2:16-CV-725
CHIEF JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Elizabeth P. Deavers

## OPINION AND ORDER

This matter is before the Court for consideration of the Defendants' Motion for Summary Judgment (ECF No. 37), which for the reasons that follow is **GRANTED IN PART AND DENIED IN PART.**

### I.

The Court offers this brief introductory statement about its decision on Defendants' Motion for Summary Judgment. A motion for summary judgment seeks to prevent a trial on the basis that the case does not contain genuine issues of material fact. For such a motion to be granted, the record must not contain any genuine issue of fact to be resolved at trial.

To be sure, an opposing party may successfully defeat such a motion with the testimony of a single witness, even if, in theory, ten other witnesses contradict the single witness' testimony. In short, the party that opposes summary judgment need only show a dispute of fact, not that the party has the stronger case.

## A.    Relevant Background

On July 25, 2014, Plaintiff Timothy W. Straits and his wife and two children attended a wedding and reception at Rising Park in Lancaster, Ohio. Both the wedding and reception occurred in or near a shelter house located on top of a hill. Shortly after the ceremony concluded, Lancaster Police Department ("Lancaster PD") received numerous reports of a fight involving several parties at the Rising Park facility. Two officers, James Schorr, Jr. and John D. Browning, were sent to the park. At the time of the incident, Officer Schorr was a patrol officer in the Lancaster PD with approximately four years of service. Officer Browning had been with the department for approximately eight months. The events underlying this lawsuit began with an altercation between Straits and other wedding guests, which the Court will review below.

### 1.    The Wedding Altercation

Straits testified on deposition that he had a very strained relationship with the bride's father, Matthew Roberts. (Straits Dep. 37–38, ECF No. 36–1.) Two to three years prior to the wedding, Straits assaulted Roberts who allegedly molested Straits' minor daughter. *Id.* Straits averred that he considered avoiding the wedding altogether because of his history with Roberts. *Id.* at 47–48.

After the wedding ceremony, which lasted 15 to 20 minutes, Straits testified that Roberts taunted him by remarking "'At least I ain't get caught jacking off when I was a kid,' or something." *Id.* at 50–52. Angered, Straits stood up from the shelter house bench where he had been sitting. *Id.* at 52. As he stood, Roberts's uncle, Larry Cox, grabbed Straits from behind and placed him in a chokehold. *Id.* at 52:23–53:8. A struggle followed; with Straits reverse head-butting Cox twice while Roberts encouraged Straits to come forward and fight with him, yelling profanities at him. *Id.* at 52–54.

2

Cox released his grip on Straits, and Straits aggressed towards Roberts. *Id.* at 54. Roberts' girlfriend, Amy Eppling, intervened and attempted to push Straits aside. *Id.* at 54. In response, Straits testified that he grabbed Eppling's hands, pushed her back, and threatened to hit her if she touched him again. *Id.* at 54–55. Straits finally reached Roberts and grabbed him. *Id.* at 55. Before Straits could throw a punch with his raised fist, Straits' father stepped in and restrained his son's arm, warning "You hit him, you're going to go to prison. You won't see your kids." *Id.* Straits released Roberts, turned away, and called his wife and children to leave. *Id.*

## 2. The Police Arrive

Straits testified that "all hell broke loose" as he attempted to leave Rising Park. (Straits Dep. at 55, ECF No. 36-1.) According to his testimony, Straits got into his red Jeep Cherokee and drove towards the entrance of the park. *Id.* at 62. Before Straits could exit, a police vehicle pulled in front of him and blocked the only egress point. *Id.* at 62–63. Heeding Officer Browning's signals, Straits stopped the Jeep and turned off the engine. *Id.* at 63. Officer Browning ordered him out of the vehicle. *Id.* Straits testified that he exited the Jeep with his arms raised, although he did not recall Officer Browning saying "put your hands up." *Id.* at 62.

Straits was visibly upset at this point, testifying that he was "heated" after his encounter with Roberts. *Id.* at 63–64. Straits was asked to explain in detail the events as they unfolded after he exited the vehicle to speak with the officer, whom he later found out was Officer Browning. Mr. Straits further testified about his interaction with Officer Browning as follows:

A. Yeah. He asked me what was going on.

Q. Okay. And that's when you responded by pointing to the shelter house?

A. Yes. I said, "If your police department did their damn job, this shit wouldn't have been going on."

Q. Now, when in that sequence had you reached out to shake his hand? Was that after you said –

A. No. When he told me to calm down, and then I said, "Yes, sir. I understand this has nothing to do with you." And my one hand was still in the air when I went to shake his hand.

Q. All right. And it was at the point where -- and you were motioning with your left hand in the air?

A. It was my right hand -- or, yeah, I'm sorry; my left hand --

Q. Left hand is in the air, and you're reaching with your right hand?

A. Yes, sir.

Q. And your testimony is you're reaching your hand to shake his hand, right?

A. Yes, sir.

Q. Did he extend his hand as if to shake yours?

A. No; he sat back, put his hands up.

*Id.* at 68–69. Straits further explained about the interaction the following:

Q. You said your hand -- you described for us how you had your hands up and with your right hand, you were pointing to the shelter house, right?

A. Yes.

Q. As you were in that physical position, hands up, pointing to the shelter house, were you standing still, or were you walking towards the police officer?

A. I was standing still.

Q. Okay. What was the distance between you and the police officer at that point?

. . .

A. Okay. No more than five, eight feet.

Q. Okay. How was he standing? With his arms at his side?

A. He was standing there with, you know, his hands, you know, in front of him, whatever.

Q. Okay.

A. But like I said, I went -- I went to shake his hand, and he kind of put his hands out and stepped back. I put my hands back up, and that's when I got bum rushed a few seconds later.

Q. When -- well, how did that – if you stuck your hand out to shake his hand, how far away from him were you when you made that motion?

A. Four or five feet, long enough for our hands. You know what I mean? He was far enough to where he had to step to my hand to shake it.

*Id.* 65–66. Several times in his testimony, Straits confirms that as he reached toward Officer Browning, the officer stepped back with his arms out in front of him and palms out toward Straits in a defensive position. *Id.* at 85, 112, 113, 114.

Straits testified about his emotional state and the tone and volume level of his voice during his conversation with Officer Browning as follows:

Q. All right. Describe for me your tone. Were you -- first of all, were you agitated because of what had happened up at the shelter house?

A. Yes, sir.

Q. Were you loud?

A. I'm sure I was, yes, sir.

Q. Okay. When you said to the first officer, "If you would do your damn job," or whatever exactly you said, were you shouting that?

A. I wasn't shouting it, but I was speaking loudly. I mean, you know, I was upset.

. . . .

Q. And when you pointed at the shelter house, were you just pointing, or were you shaking your hand?

A. I was just pointing like -- well, I might have shook my hand once or twice. I don't know, but I don't know if I was pointing towards the shelter house.

*Id.* at 72–73.

### 3.    The Arrest According to Plaintiff

Straits testified that right after he reached to shake Officer Browning's hand, Officer Schorr, without issuing a verbal warning, seized Straits around the neck from behind, forced him into a chokehold, and tackled him to the ground, resulting in his face smacking the ground and leaving "blood all over the pavement." (Straits Dep. 73:22–75:6–12, ECF No. 36–1.) When asked about the series of events, Straits testified:

Q. Okay. What do you remember – physically, what do you remember next?

A. Getting my face tooken into the ground.

Q. Okay. Was it pavement?

A. Yes. There was blood all over the pavement, and he rolled me over. Punched me in my face. That's when I grabbed him and hit him.

Q. How did he [Schorr] punch you in the face?

A. Closed fist, just right in the nose.

*Id.* at 75.

Straits testified that after the punch, he "grab[bed] [Officer Schorr] and hit him." *Id.* at 74. Straits testified that he hit Officer Schorr because "[he] had a right to," testifying: "He never told me I was under arrest. He had no reason to rush me. Had no reason at all to put his hands on me." *Id.*

After Straits began resisting Officer Schorr, Straits' testimony is not clear as to the events that occurred. He was unsure how long he was on the ground and when exactly he was handcuffed and tased. He avers that "[i]t all happened so quick." *Id.* at 78, 79. He testified that at some point Officer Schorr disappeared for a minute and "body slammed" his wife. *Id.* at 75. And subsequently, Straits was lying face-up with Officer Browning's hand on his chest, while the

officer kneeled beside him telling him to "calm down, calm down" *Id.* at 76–78. Straits testified

he was "screaming" at Officer Browning, telling him that "I want him. I want him" (referring to

Officer Schorr). *Id.* at 78. Straits further testified: "I honestly, to this day, I can't tell you if I was

standing when I got tazed or if I was laying on the ground when I got tazed." *Id.* at 81. But,

Straits does remember that he was tazed and that he was subsequently handcuffed and taken by

ambulance to the hospital, where he was treated and then taken to jail. *Id.* at 92.

### 4.     The Arrest According to Officers Schorr and Browning

While Officer Browning drove to the parking lot and engaged Straits, Officer Schorr

drove to the shelter house. At this point, the testimony of Officers Browning and Schorr about

the arrest is markedly different than Straits' testimony. Officer Schorr testified that he was

standing at the shelter house and looking in the direction of the parking lot when he saw Straits

confronting Officer Browning, heard Officer Browning's raised voice, and heard Straits "cursing

in a loud, excited voice." (Schorr Dep. 45:7–46:13–16, ECF No. 43.) Officer Schorr ran down

the hill towards the parking lot and saw Officer Browning in the defensive position about which

Straits testified, *i.e.,* one foot stepped back and his hands palms out in front of his body. *Id.* at

45–46. Officer Schorr testified that Straits's hands were in the air, and that Officer Browning's

right hand was cross-drawn to unsnap his Taser. *Id.* at 49. When Officer Schorr was within 50

feet of Straits, he noticed Officer Browning had unsnapped his Taser. *Id.* at 50–52.

Believing his partner to be in danger, Officer Schorr testified "I elected that I was going

to grab Mr. Straits's left hand" from behind in an attempt to subdue him. *Id.* at 54. Without

issuing a verbal warning, Officer Schorr attempted to pull Strait's left hand behind his back. *Id.*

at 55–56, 60. Before Officer Schorr could produce handcuffs, Straits jerked away, looked at

Officer Schorr and punched him in the chest. *Id.* at 63. According to Officer Browning's

testimony, at that point "they [Officer Schorr and Straits] just started fighting. Punches were thrown." (Browning Dep. at 16, ECF No. 42.) During the ensuing struggle, Officer Schorr testified that he punched Straits in the face with a closed fist, after being hit by Straits multiple times. (Schorr Dep. 64, ECF No. 43.)

While grappling with Straits on the ground, Officer Schorr testified he felt himself being struck in the back of the head. *Id.* at 64. Turning, Officer Schorr realized Mrs. Straits was attempting to intervene. *Id.* at 67. Officer Schorr testified "I saw her draw back to kick me." *Id.* In response, Officer Schorr grabbed Mrs. Straits' foot, pulled her to the ground, and handcuffed her. *Id.* Officer Browning physically engaged with Straits while Officer Schorr was handcuffing Mrs. Straits. Officer Browning testified he tackled Straits and ended up "underneath, on the bottom, on my back, holding on to Straits." (Browning Dep. at 28, ECF No. 42.) Officer Schorr testified that Straits was screaming profanities and threatening the officers. (Schorr Dep. at 67–68, ECF No. 43.)

According to Officer Schorr's testimony, the physical altercation continued to the point he became concerned that Officer Browning was losing control. *Id.* at 68. Officer Schorr then deployed his Taser, hitting Straits in his abdomen. *Id.* at 68–69. Officer Schorr testified that the Taser did not seem to work because it did not immobilize Straits at all, remarking "It didn't seize him [Straits] up. He didn't stop. It didn't seem to put a break in anything." *Id.* at 69–70. At that time a third Lancaster PD officer arrived. *Id.* at 70. Together, the three officers subdued Straits. *Id.*

### 5. Criminal Charges

Straits was charged with resisting arrest and assaulting a police officer. *Id.* at 92. The prosecutor later dropped all charges against Straits. *Id.* at 93.

**B.     Procedural Background**

Straits brought suit against Officer Schorr and the Lancaster PD in this Court on July 22, 2016 (ECF No. 1). Straits brings claims under federal law for excessive use of force, malicious prosecution, false arrest, and deliberate indifference and failure to train. Straits also filed a claim under Ohio law for false imprisonment.

On June 29, 2017, Defendants filed a Motion for Summary Judgment, moving for judgment as a matter of law on all of Straits claims for relief. (ECF No. 37.) On August 10, 2017, Plaintiff filed his Memorandum in Opposition to Defendants' Motion for Summary Judgment (ECF No. 44), and Defendants filed their Reply Brief in Support of their Motion for Summary Judgment on August 22, 2017 (ECF No. 45).

## II.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir.1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

## III.

The Court will consider Plaintiff's federal law claims brought under 42 U.S.C. § 1983, which include: excessive use of force by Officer Schorr in violation of the Fourth and Fourteenth Amendments to the United States Constitution, malicious prosecution in violation of the Fourth Amendment, and false arrest in violation of the Fourth Amendment. The Court will also address Straits' state law claim of false arrest concurrently with its matching federal claim.

### A.    Liability Under Section 1983

Section 1983 is "not itself a source of substantive rights," rather it provides plaintiffs with a method for "vindicating rights otherwise conferred." *Graham v. Connor*, 490 U.S. 386, 393–394 (1989). "To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the Constitution or laws of the United States and must show that the deprivation of that right was committed by a person acting under color of state law." *Harbin-Bey v. Rutter*, 420 F.3d 571, 575 (6th Cir. 2005) (citing *West v. Atkins,* 487 U.S. 42, 48 (1988)).

Defendants move for summary judgment arguing that Officer Schorr is entitled to qualified immunity. The doctrine of qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Hills v. Kentucky*, 457 F.3d 583, 587 (6th Cir. 2006). "Plaintiff bears the burden of showing that defendants are not entitled to qualified immunity." *Chappell v. City Of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009) (citing *Untalan v. City of Lorain,* 430 F.3d 312, 314 (6th Cir. 2005)). "Plaintiff must show both that, viewing the evidence in the light most favorable to her, a constitutional right was violated and that the right was clearly established at the time of the violation." *Chappell v. City*

*Of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009). *Id.* (citations omitted). "If plaintiff fails to show either that a constitutional right was violated or that the right was clearly established, she will have failed to carry her burden." *Id.* In determining whether the required showing has been made, the trial court has discretion to decide which of the two elements to address first. *Pearson*, 555 U.S. 223, 236 (2009). Yet, "when the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury, the jury becomes the final arbiter of a claim of immunity." *Bouggess v. Mattingly*, 482 F.3d 886, 888 (6th Cir. 2007) (internal quotation marks and alteration omitted).

**B.     Excessive Use of Force**

In this case, Straits avers in his Complaint that Officer Schorr violated the Fourth and Fourteenth Amendments by utilizing excessive force while arresting Straits. Although Straits refers to the Fourteenth Amendment in his Complaint, he does not dispute Defendants' correctly held position that his claims are properly analyzed only under the Fourth Amendment. (Def.'s Mot. for Summ. J. at 20.) "*[A]ll* claims that law enforcement officers have used excessive force in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen are to be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Slusher v. Carson*, 540 F.3d 449, 454 (6th Cir. 2008) (quoting *Graham*, 490 U.S. at 395). Consequently, the Court will analyze Straits' excessive force claim only under the Fourth Amendment.

**1.     Constitutional Violation**

Straits asserts that Officer Schorr violated his constitutional right to be free of excessive force by "slamming an unarmed man into the ground . . . without first announcing to the victim to refrain from some allegedly unlawful behavior." (Pl's. Mem. in Opp. at 11, ECF No. 44.) Under the Fourth Amendment, individuals have a right to be free of excessive force when police

make an arrest or seizure. *See Graham*, 490 U.S. at 394–95. "The Fourth Amendment requires that an officer's use of force be objectively reasonable, and courts must balance the consequences to the individual against the government's interests in effecting the seizure." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002) (citing *Graham*, 490 U.S. at 396).

"This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Id.* "In determining whether an officer's actions were objectively reasonable, courts must view the reasonableness of any seizure in light of the totality of the circumstances, analyzing the facts 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Darrah v. City of Oak Park*, 255 F.3d 301, 307 (6th Cir. 2001) (quoting *Graham*, 490 U.S. at 396, 109 S.Ct. 1865). "The *Graham* Court emphasized that, when conducting the reasonableness inquiry, [the court] must keep in mind the 'tense, uncertain, and rapidly evolving' circumstances in which officers are forced to make difficult decisions about the appropriate level of force to be used." *Id.* (citing *Graham*, 490 U.S. at 397). "In addition, when determining the reasonableness of the force used, courts should pay particular attention to 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (citing *Graham*, 490 U.S. at 396).

In the instant action, when viewing the totality of the circumstances in the light most favorable to Straits, the Court finds that there is an issue of fact as to whether Officer Schorr's actions were objectively reasonable. While the Court agrees with Defendants that Officer Schorr reasonably suspected Straits of committing a violent crime, and Officer Schorr reasonably believed Straits posed a threat to his partner, the reasonableness of his attempt to seize Straits

depends upon whose version of the facts are credited. As indicated above, when "the legal question of immunity is completely dependent upon which view of facts is accepted by the jury," the Court cannot find qualified immunity as a matter of law. *Brandenburg v. Cureton*, 882 F.2d 211, 216 (6th Cir. 1989). The Court explains this conclusion below.

First, the Sixth Circuit has characterized the suspected crime of assault as a "violent offense." *Goodrich v. Everett*, 193 Fed. Appx. 551, 555 (6th Cir. 2006). In the case *sub judice*, an officer at the scene could have reasonably suspected Straits of committing an assault. Officer Schorr and Officer Browning received an urgent call from a dispatcher who informed them that there was an active fight at Rising Park involving multiple parties. Indeed, Straits himself testified that numerous 911 calls were made during the altercation at the wedding. Officer Schorr also testified that his watch commander authorized emergency mode lights and sirens for response to the 911 calls. (Schorr Dep. 43, ECF No. 43.) Additionally, when Officer Schorr arrived at the scene, he testified that multiple people ran up and said "There's a fight. There's a large fight." *Id.* at 44. Officer Schorr approached an agitated Roberts, who stated "He hit me" while gesturing down the hill towards Straits. *Id.* at 44–46.

Even though Straits was reasonably suspected of committing a violent assault a very short time before he was alone with an officer who was new to the force, Officer Browning, Straits contends that no reasonable officer could have thought he posed an immediate threat to Officer Browning. Straits asks:

> [H]ow does any police officer objectively justify slamming an unarmed person to the ground when that person is not brandishing a weapon or even close enough to a fellow officer to pose a threat?
>
> If Straits had been fighting with Officer Browning before Schorr slammed him to the ground, or if Straits had a gun, or a knife, or a baseball bat or a rock in his hand, Officer Schorr might be able to objectively justify his action of slamming plaintiff to the ground without first announcing his presence [i.e., In a

command voice shouting "Police: Hands in the air, drop the gun or the rock," or something to that effect]. However, there is no way to justify stealthily bum rushing an unarmed person from behind and taking them to the ground. That's how the Fascists behaved in the thirties and forties in Nazi occupied Europe. That behavior is not consistent with the protections afforded by our Constitution.

(Pl.'s Mem. in Opp. at 11.)

Initially, the Court notes that the inquiry is neither whether the suspect was armed nor whether the least intrusive means were utilized to accomplish a seizure. Whether Officer Schorr "applied unconstitutionally excessive force in tackling [Straits] turns on what a reasonable officer would have done under similar circumstances." *Lyons v. City of Xenia*, 417 F.3d 565, 576 (6th Cir. 2005) (emphasis added). "The question is whether the undisputed facts 'demonstrate that a hypothetical reasonable officer' would have 'known that his actions, under the circumstances, were objectively unreasonable,' not whether Officer [Schorr] used the least intrusive means available." *Id.* (internal citations omitted).

The Sixth Circuit has recognized a police officer may reasonably infer a safety threat exists from his/her partner's voice inflection and body language. *Lyons*, 417 F.3d at 577. In *Lyons*, after his partner radioed him for backup from inside a home, Officer Foubert rushed into the residence and forced the female plaintiff to the ground in a "football-like" tackle without announcing himself. *Id.* The court found that this unannounced tackling was not sufficient to establish a constitutional violation because it was reasonable for the officer to fear for his partner's safety based on, *inter alia*, the close proximity of the suspect to the officer and the yelling that was occurring between the two. *Id.* at 576–77.

The *Lyons* court differentiated cases where an unannounced tackling of a suspect rose to the level of excessive force, explaining:

> Where by contrast tackling has risen to the level of excessive force, that was because

14

(1) the claimants did not pose a tenable threat to the officers' safety, *see Meredith v. Erath,* 342 F.3d 1057, 1061 (9th Cir. 2003) (holding that it was objectively unreasonable to throw a lone woman to the ground for protesting a search warrant served by twelve IRS agents); *Santos v. Gates,* 287 F.3d 846, 854–56 (9th Cir. 2002) (determining that a jury could find police used excessive force against the plaintiff by throwing him to the ground and breaking his back after he had dropped to his knees with his hands behind his head and was admittedly "passive"); *McNew v. Pleasant,* 1992 WL 162255, at *4 (N.D.Ill. July 6, 1992) (holding that a jury could find that the police used excessive force against a plaintiff who was walking through a park and whom the officers tackled, kneed and injured after he did not immediately stop when requested);

(2) the police did more than just tackle the suspect, *see Phelps v. Coy,* 286 F.3d 295, 298, 302 (6th Cir. 2002) (court found constitutional violation for summary judgment purposes where plaintiff alleged that officers tackled him, hit him, and slammed his head into the floor three times); *Barlow v. Ground,* 943 F.2d 1132, 1136 (9th Cir. 1991) (police tackled suspect and put him in a punishing "pain compliance hold"); or

(3) the police did not have an adequate level of suspicion to justify any seizure at all, *see Goodson v. City of Corpus Christi,* 202 F.3d 730, 740 (5th Cir. 2000); *cf. Vathekan v. Prince George's County,* 154 F.3d 173, 180 (4th Cir. 1998) (holding that a jury could find objectively unreasonable a police officer's decision to set loose a police dog in a residential home without a verbal warning, when that dog mauled and seriously disfigured the plaintiff, who was sleeping at the time).

*Lyons v. City of Xenia*, 417 F.3d 565, 578 (6th Cir. 2005).

Even when crediting Straits testimony, and viewing the facts in the light most favorable to him, a jury could certainly find that Officer Schorr reasonably perceived a tenable threat to his partner's safety and had an adequate level of suspicion to justify a seizure. That is, Straits was not in a passive or submissive stance, indeed the opposite. Straits testified that when he got out of his vehicle to speak to Officer Browning he was upset and heated from the wedding altercation, he spoke loudly while shaking his hands in the air, after Officer Browning told him to calm down Straits left one hand in the air and reached his other hand toward Officer Browning while he was four to five feet away from him, which caused Officer Browning to step back into a defensive posture with his arms out in front of him palms facing outward. An officer could have reasonably perceived the situation as rapidly evolving and potentially dangerous. Officer Schorr

was responding to emergency calls and reasonably believed that Straits had just assaulted a guest at the wedding.

However, crediting Straits testimony as the Court must, Officer Schorr did not stop at the unannounced tackling but instead rolled Straits over and punched him in his bloody face with a closed fist. And while Defendants argue that there is no dispute that Straits was actively resisting arrest, their focus misapprehends the relevant timing. According to Straits testimony, Officer Schorr punched Straits in the face *before* Straits began resisting arrest. If Straits were actively resisting before he was punched, in the totality of the circumstance with which Officer Schorr was faced at that moment, the Court would reach a different conclusion. Straits, however, testified that he punched Officer Schorr and began to resist arrest *after* Officer Schorr punched him in the face. A reasonable jury could find that this unprovoked punch in the face of a non-resisting suspect crossed the "sometimes hazy border between excessive and acceptable force." *Miller v. Sanilac Cnty.*, 606 F.3d 240, 252 (6th Cir. 2010).

### 2. Clearly Established

Having determined that there is an issue of fact as to whether Straits' constitutional rights were violated by Officer Schorr, the Court must now turn to the clearly established element of the analysis. "To satisfy this second prong of the qualified immunity analysis, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Shreve v. Jessamine County Fiscal Ct.*, 453 F.3d 681, 688 (6th Cir. 2006) (citing *Clemente v. Vaslo,* 679 F.3d 482, 490 (6th Cir. 2012) and *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). "The key inquiry is whether a defendant claiming qualified immunity 'was on notice that his alleged actions were unconstitutional.'" *Id.* (citations omitted). The inquiry 'must be undertaken in light of the specific context of the case, not as a broad general

proposition.'" *Clemente,* 679 F.3d at 490 (quoting *Brosseau v. Haugen,* 543 U.S. 194, 198 (2004)).

This prong of the qualified immunity analysis too is determined by whose version of the facts is believed. As discussed in detail above, and crediting Straits testimony as the Court must, after Officer Schorr tackled Straits he turned him over and punched him with a closed fist in the face. Straits was not resisting arrest nor attempting to flee from apprehension. Officer Browning was standing a few feet away, in a defensive position. Thus, here the Court must ask: Would a reasonable officer in Officer Schorr's position understand it to be an unconstitutional use of force to punch in the face a perceived dangerous suspect, who is pinned underneath the officer and not resisting arrest, while his partner stood a few feet away?

The Court finds that a reasonable jury could determine that the punch in the face by Officer Schorr was an unprovoked, gratuitous use of force. The Sixth Circuit has been unequivocal in its findings about the use of gratuitous force during an arrest, stating repeatedly what it said in *Shreve, supra*:

> Cases in this circuit clearly establish the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest. In *Phelps,* 286 F.3d at 302, we held that *Adams,* 31 F.3d at 389, clearly established in 1991 the unconstitutionality of the use of gratuitous force against helpless and incapacitated suspects during arrest.

*Shreve*, 453 F.3d at 688. Consequently, no reasonable officer could have thought the alleged actions taken by Officer Schorr were lawful.

Thus, based on the foregoing, the Court **DENIES** Defendants' Motion for Summary Judgment on Plaintiff's excessive force claim.

## C.  False Arrest

"A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Voyticky v. Village of Timberlake, Ohio,* 412 F.3d 669, 677 (6th Cir.2005); *see also Brooks v. Rothe,* 577 F.3d 701, 706 (6th Cir. 2009). Similarly, "[u]nder Ohio law, the existence of probable cause to arrest defeats a false arrest claim. *Drake v. Village of Johnstown, Ohio*, 534 Fed. Appx. 431, 443 (6th Cir. 2013) (citing *Harvey v. Horn*, 33 Ohio App.3d 24 (1986)). "A police officer has probable cause if there is a 'fair probability' that the individual to be arrested has either committed or intends to commit a crime." *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002) (citing *Northrop v. Trippett*, 265 F.3d 372, 379 (6th Cir. 2001) and *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). To determine whether Officer Schorr had probable cause to arrest Straits, this Court must consider the totality of the "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person . . . in believing . . . that the suspect has committed, is committing, or is about to commit an offense." *Hinchman v. Moore*, 312 F.3d 198, 204 (6th Cir. 2002) (citing *Criss v. City of Kent,* 867 F.2d 259, 262 (6th Cir. 1988). "The belief of guilt must be particularized with respect to the person to be . . . seized." *United States v. Romero,* 452 F.3d 610, 616 (6th Cir. 2006) (internal quotation marks and alteration omitted).

In the case *sub judice*, as discussed *supra*, Officer Schorr reasonably believed Straits had assaulted a wedding guest. And, he also reasonably believed that Officer Browning was in a dangerous position. There is no dispute that Straits assaulted Officer Schorr and that he resisted arrest. Straits himself testified that he punched Officer Schorr in the face because he thought the officer had no right to forcibly attempt to subdue and arrest him. He further testified that he fought with Officer Schorr as the officer attempted to subdue and handcuff him. Thus, the

totality of the facts and circumstances within Officer Schorr's knowledge are amply sufficient to warrant a prudent person into believing that Straits committed, was committing, or was about to commit an offense. Consequently, Officer Schorr did not lack probable cause to arrest Straits.

Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment on his state and federal false arrest claims.

**D.    Malicious Prosecution**

The Sixth Circuit recognizes a constitutionally viable claim of malicious prosecution under the Fourth Amendment to the Unites States Constitution. *Barnes v. Wright*, 449 F.3d 709, 715–16 (6th Cir. 2006). A § 1983 claim for malicious prosecution "encompasses wrongful investigation, prosecution, conviction, and incarceration." *Id.* In *Skyes v. Anderson*, the Sixth Circuit articulated the elements of a Fourth Amendment malicious prosecution claim. *Skyes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010). First, the plaintiff must demonstrate a criminal investigation was initiated against him/her, and the defendant "ma[d]e, influence[d], or participate[d] in the decision to prosecute." *Id.* (quoting *Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007)). Second, the plaintiff must show the defendant lacked probable cause for the criminal prosecution. *Skyes*, 625 F.3d at 308. Third, the plaintiff must prove the plaintiff suffered a "deprivation of liberty" (besides the initial seizure) as a result of the criminal prosecution. *Id.* (quoting *Johnson v. Knorr*, 477 F.3d 75, 81 (3d Cir. 2007)). And fourth, the criminal prosecution must have ended in favor of the plaintiff. *Skyes*, 625 F.3d at 309.

Defendants argue that they are entitled to summary judgment because Straits' "apprehension and arrest were supported by probable cause." (Def.'s Mot. for Summ. J. at 20.) "In order to distinguish appropriately this claim from one of false arrest, [this Court] must consider not only whether the Defendants had probable cause to arrest the Plaintiff[] but also

whether probable cause existed to initiate the criminal proceeding against the Plaintiff[]." *Sykes*, 625 F.3d at 310–11. As to this inquiry, however, the Sixth Circuit regularly finds that probable cause, or the lack of probable cause, at the time of arrest is sufficient if no evidence is presented that would call this finding into question. *See e.g.*, *Id.* at 311 ("We have already concluded that the Defendants lacked probable cause to arrest Sykes, and the Defendants have pointed to no evidence uncovered subsequent to Sykes's arrest that would call into question the jury's belief that there was no probable cause to initiate criminal proceedings against her."); *Fox v. DeSoto*, 489 F.3d 227, 237–38 (6th Cir. 2007) ("Fox cannot prevail on the claim for malicious prosecution" because no evidence intervened since the finding of probable cause for arrest).

The Court agrees with Defendants that Straits' apprehension and arrest were supported by probable cause. There is no dispute that Straits assaulted Officer Schorr or that he resisted arrest. Straits testified that he punched Officer Schorr and fought with him because he did not believe the officer had the right to touch him or to arrest him. Further, Officer Schorr reasonably believed that Straits assaulted a wedding guest. Consequently, Straits' arrest for assault and resisting arrest were supported by probable cause and there is no evidence that the probable cause was called into question when the prosecutor brought charges against Straits for assault and resisting arrest.

Therefore, the Court **GRANTS** Defendants' Motion for Summary Judgment on Plaintiff's malicious prosecution claim.

## IV.

Straits brings a claim against the Lancaster PD for its alleged failure to train Officer Schorr. A municipality may be liable for its police officer's unconstitutional acts if the police department's failure to train amounts to "deliberate indifference to the constitutional rights of

persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 379 (1989). To trigger municipal liability under § 1983, the deprivation of constitutional rights must have occurred "pursuant to official municipal policy of some nature." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 691 (1978). Put another way, the police department's official policy must be the "moving force of the constitutional violation." *Id.* at 694.

To establish deliberate indifference and failure to train under *Monell*, the plaintiff must demonstrate four elements: (1) the defendant officer committed a constitutional violation, (2) the "City's training program was inadequate for the task that officers must perform," (3) "the inadequacy was the result of the City's deliberate indifference," and (4) "the inadequacy was closely related to or actually caused the injury." *Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2007) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)); *Ciminillo v. Streicher*, 434 F.3d 461, 469 (6th Cir. 2006).

Defendants move for summary judgment on this claim, arguing that "Plaintiff has failed to establish that any official policy or custom of Defendant Lancaster PD was a moving force behind any alleged constitutional violation. Plaintiff's claim that an official policy of custom of Lancaster PD was a moving force behind his alleged constitutional violation is not supported by any evidence." (Defs.' Mot. for Summ. J. at 23.) This Court agrees.

Straits offers no evidence, or even argument, to support this claim related to Officer Schorr's actions. He merely states:

> If the City of Lancaster Police Department instructs its uniformed patrol officers to physically assault citizens of the city when there is no evidence of imminent harm to anyone, then the City has a policy of demonstrating deliberate indifference and a lack of proper training.

(Pl.'s Mem. in Opp. at 9.) This falls far short of providing actual evidence that the City of Lancaster Police Department instructs its officers to assault citizens as Straits suggests.

With regard to Officer Browning, Straits offers a bit more substance, stating:

> Officer Browning in his deposition testimony concedes that he was too new on the force to know what to do to deal with Officer Schorr rushing plaintiff from the rear and tackling plaintiff without any warning or justification. [Doc. 42-1, p. 10, 16]. Thus, evidence has been adduced to support Court Three of the Complaint, Deliberate Indifference and Failure to Train.

*Id.* at 1.

> However, as Defendants correctly point out in their Reply Brief:

> Straits' "failure to train" claim is his allegation that the Lancaster PD 'fail[ed] to properly train defendant Schorr.' [Doc. 1, p. 3] (Emphasis added). His Complaint does not allege that Lancaster PD failed to train Ofc. Browning, or any other officer for that matter. Accordingly, Ofc. Browning's testimony concerning his own experience has no relevance whatsoever to Straits' failure to train claim.

(Defs.' Reply at 8, ECF No. 45.) Moreover, as Defendants also appropriately highlight:

> Straits argues his claim against Lancaster PD – specifically his "failure to train" claim – should not be dismissed because Ofc. Browning "conceded" during his deposition "that he was too new on the force to know what to do to deal with Ofc. Schorr rushing [Straits] from the rear and tackling [Straits] without any warning or justification." [Doc. 44, p. 1]. This mischaracterization of Ofc. Browning's deposition testimony is cleared by reviewing that portion of the transcript to which Straits is referring:

>> (A: Ofc. Browning): I see Officer Schorr come running down the hill. I'm a new officer. Eight months' experience. I wasn't quite sure what was going on. Officer Schorr, you know, came down, approached. He – it all happened really fast. It looked like he grabbed the arm of Mr. Straits. [Doc. 42, p. 16].

> Ofc. Browning did *not* concede he did not know what to do to deal with Ofc. Schorr's actions; he simply stated he was not sure what was happening because the events unfolded so quickly.

*Id.*

Finally, to the extent it can be said that Straits has a failure to train claim based upon the actions of Officer Browning, Straits fails to meet his burden to demonstrate that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been

deliberately indifferent to the need." *Harris*, 489 U.S. at 390. Indeed, he makes no attempt to show that Defendants' alleged failure to train Officer Browning was pursuant to some municipal policy that was the moving force behind the injury caused by Officer Schorr's alleged unconstitutional use of force.

Consequently, the Court **GRANTS** Defendants' Motion for Summary Judgment on Plaintiff's deliberate indifference and failure to train claim.

V.

For the reasons stated above, the Court **DENIES** Defendants' Motion for Summary Judgment on Plaintiff's claim of excessive force and **GRANTS** the Motion on all other claims. The Court reiterates that it makes no finding as to the merits of the underlying claim that has survived summary judgment. The Court only concludes that, accepting Straits' version of the facts, it cannot provide qualified immunity to Officer Schorr as a matter of law. It will be for the jury to believe, or not believe, Straits' version of the facts.

**IT IS SO ORDERED.**

_____2 - 5 - 2018_____
**DATE**

_____
**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**